**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

LENAMAE WOODING,

                                        Plaintiff,

              - v -                                              Civ. No. 6:03-CV-1282
                                                                        (FJS/RFT)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

**APPEARANCES:**                                       **OF COUNSEL:**

AMDURSKY, PELKY LAW FIRM                          GREGORY R. GILBERT, ESQ.
Attorney for Plaintiff
26 East Oneida Street
Oswego, NY 13126

HON. GLENN T. SUDDABY                             WILLIAM H. PEASE
United States Attorney for the Northern District of New York    Assistant United States Attorney
Attorney for Defendant
P.O. Box 7198
100 South Clinton Street
Syracuse, NY 13261

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

        In this action, Plaintiff Lenamae Wooding moves, pursuant to 42 U.S.C. § 405(g), for review

of a decision by the Commissioner of Social Security denying her application for Supplemental

Security Income (SSI).[1]  Generally, Wooding alleges a disability due to a herniated and bulging disc

in her back as well as neck and right knee pain, all stemming from a motor vehicle accident that

---

[1] This case has proceeded in accordance with General Order 18 which sets forth the procedures to be followed when
appealing a denial of Social Security benefits.  Both parties have filed Briefs, though oral argument was not heard.  Dkt. Nos.
6 & 7.  The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(d).

occurred on October 29, 1999.  Dkt. No. 3, Admin. Tr. [hereinafter "Tr."] at pp. 13, 96, & 136.  Based upon the following discussion, this Court recommends that the Commissioner's decision denying SSI be **reversed** and the case be **remanded** for further proceedings.

## I.  BACKGROUND

### A.  Medical History

On October 29, 1999, Wooding was a passenger in a motor vehicle that crashed into a tree at forty miles per hour.  Tr. at p. 136.  That evening, Wooding was treated in the emergency room at Crouse Hospital for pain in her neck, back, and right leg.  *Id*. at pp. 136-39.  Upon examination, diffuse tenderness was noted on her neck, both centrally and medially, though flexion and extension of the neck were intact with mild discomfort.  *Id*. at p. 136.  There was no tenderness evidenced on the costovertebral angle (CVA)[2] nor lumbar spine.  *Id*.  X-rays of Wooding's cervical spine, chest, sternum, pelvic, right hip, and right knee were all "felt to be negative" by the attending doctor.  After reviewing the x-rays, the attending doctor re-examined Wooding's back and found diffuse muscular tenderness around the vertebral muscles of the thoracic spine area.  *Id*.  There was no focal tenderness over the thoracic spine area, and, again, there was no CVA nor lumbar spine tenderness.  *Id*. at pp. 136-37.  Wooding experienced pain with rotation of her right hip and had tenderness over the patellar and infrapatellar regions of her right knee.  She experienced minimal pain with percussion of the patella and there was no swelling nor deformity of her right knee.  *Id*. at p. 137.

---

[2] "Costovertebral" pertains to the ribs and the thoracic vertebrae; the "costovertebral angle" or CVA is the "acute angle formed between either twelfth rib and the vertebral column."  STEDMAN'S MEDICAL DICTIONARY 671 (27th ed. 2000) (*available at* http://www.stedmans.com/section.cfm/45 (last visited May 28, 2008)).

In February 2000,[3] Wooding began treatment with Brett Tallants, D.C., a chiropractor.  Dr. Tallants opined that Wooding could only sit and stand for a total of four hours and walk for two hours in an eight-hour workday.  *Id*. at pp. 194-95.  The most weight she could carry and/or lift was ten pounds.  He assessed that Wooding was unlimited in her ability to use her hands and legs for repetitive actions and movements such as simple grasping, pushing, pulling, and fine manipulation.  *Id*. at p. 194.  Dr. Tallants further opined that Wooding could occasionally bend, squat, crawl, and reach, but should never climb, and restricted her from ever climbing unprotected heights.  Dr. Tallants found Wooding had no restrictions in being around moving machinery, exposure to marked changes in temperature and humidity, and exposure to dust, fumes, and gases, but she was mildly restricted in her ability to drive automobile equipment.  *Id*. at p. 195.

In April 2000, Wooding began treatment with Harold Weichert, M.D., an orthopedist, and continued such treatment until July 18, 2001.  *Id*. at pp. 161-76.  At the initial consultation, Wooding complained of pain in her right knee which would give out and "sometimes lock[] or catch[]."  *Id*. at p. 172.  She reported that her chiropractic treatment with Dr. Tallants helped with her back.  *Id*.  Upon examination, Dr. Weichart observed that Wooding walked with a limp, moved slowly, and there was a "popping sensation" from the retropatellar area upon flexion and extension of the right knee.  She had full range of motion of her right knee, neck, and spine.  *Id*.  Right ankle reflex, however, was absent.  *Id*.  Dr. Weichart's impression was to "[r]ule out internal derangement of the right knee [and] [q]uestion of right sciatica involvement reflected by the fact that the ankle reflex is absent."  *Id*. at p. 171.

A magnetic resonance imaging (MRI) of her right knee, performed on May 12, 2000, was

---

[3] The only medical records provided during the interim were that of Daniel Coty, D.O., who performed laparoscopic surgery at Oswego Hospital for suspected endometriosis.  *See* Tr. at pp. 140-45.  The treatment of Wooding's pelvic pain and plan for laparoscopic surgery pre-dated Wooding's motor vehicle accident, though the surgery was performed within approximately a week of the accident.  *See id*. at p. 143 (operative notes dated Nov. 8, 1999).

normal.  Tr. at pp. 170 & 176.  Nevertheless, Wooding continued to complain of pain, swelling, and "feeling something shifting" in her right knee.  *Id*. at p. 170.  Dr. Weichart diagnosed Wooding with internal derangement of the right knee and performed arthroscopic surgery on August 1, 2000.  During the surgery, Dr. Weichert observed that the undersurface of the patella and apposing surface of the trochlea were normal and intact.  *Id*. at p. 149.  There was, however, a gross lesion on the undersurface of the femur with large pieces of articular cartilage hanging down, which was shaved; the rest of the medial compartment was normal.  *Id*.  The upper surface of the tibia was intact and the meniscus did not have any tears.  *Id*.  The lateral compartment of the knee was "pristine," and the undersurface of the femur as well as the upper surface of the tibia and lateral meniscus were normal.  *Id.*  Following the surgery, Dr. Weichart started Wooding on a physical therapy regiment, however, he terminated that course of treatment after she experienced swelling, numbness, and redness in her right leg.  *Id*. at pp. 147-50 (surgical reports), 151-59 (physical therapy progress notes), 166 & 168 (Dr. Weichart's progress notes).

Thereafter, Wooding continued to complain of pain in her right lumbar spin radiating from her right foot to her buttocks.  A MRI of her lumbar spine, conducted in September 2000, showed a small disc herniation at L4-5 with some anterior thecal sac deformity, slightly more on the right side.  *Id*. at p. 175.  At that point, on September 20, 2000, Dr. Weichart directed that Wooding not perform any lifting, bending, or twisting.  *Id*. at p. 165.  After discussing various options ranging from steroid epidural injections to surgery, it was decided that Dr. Weichart would perform a microdiscectomy. Ultimately, however, such procedure was not performed until November 2, 2002, due to problems with insurance and then having to switch doctors after Dr. Weichart retired from practice.  *Id*. at pp. 161 (Dr. Weichart's progress note, dated Oct. 18, 2000, noting desire to perform surgery), 178 (orthopedic clinic

progress note, dated Sept. 24, 2001, noting problems Wooding was having with insurance company),

196 (Dr. Weichart's progress note, dated Nov. 14, 2001, noting surgery to be scheduled for February

19, 2002), 203 (Dr. Matan's progress notes, dated Nov. 5, 2002, noting surgery performed on Nov. 2,

2002).

    In the interim, Wooding applied for SSI benefits and was consultively examined by Kalyani

Ganesh, M.D.  *Id.* at pp. 179-87.[4]  At the orthopedic examination, conducted on September 28, 2001,

Dr. Ganesh noted that flexion of the lumbar spine was at 45°, extension was limited by pain, lateral

flexion was 15°, and rotation was 15° limited by pain.  *Id.* at p. 181.  There was spinal and right

paraspinal tenderness as well as sacroiliac joint tenderness.  *Id.*  Full range of motion was noted in the

hips, knees, and ankles bilaterally.  Wooding's right patellar jerk was absent in the right knee, but

"brisk" in the left.  *Id.*  No joint effusion, inflammation, nor instability was noted.  *Id.*  Based upon the

examination, and after reviewing x-rays of Wooding's cervical spine, lumbar spine, and right knee, Dr.

Ganesh opined:

> [Wooding] has no limitation to sitting, standing, or the use of her upper extremity.  She
> has mild-to-moderate limitation to walking and climbing.  She has mild to moderate
> limitation to lifting, carrying, pushing, pulling, and bending.

*Id.* at p. 182.

    In September 2002, after Dr. Weichart retired from practice, Wooding began treatment with

Anthony Matan, M.D., and Robert Garrison, M.D., spinal specialists.  *Id.* at pp. 198-210.  At the initial

examination, Dr. Matan observed Wooding sitting with discomfort in her leg, which was straight out

during the interview.  *Id.* at p. 199.  Deep tendon reflexes in the knee were absent.  Light touch

sensation was diminished in the L5 and along the SI distribution when compared to the left side which

---

[4] Dr. Ganesh performed two consultive exams, first, an orthopedic examination was conducted on September 28, 2001, and then, on October 11, 2001, an internist examination was completed due to Plaintiff's complaints and new diagnosis of asthma.

was intact.  *Id*.  Dr. Matan reviewed a MRI taken on January 7, 2002, and noted evidence of disc

desiccation and herniation at L4-5, more on the right side that abuts the L5 nerve root.  *Id*.

After finally settling the insurance disputes, Dr. Matan performed a microdiscectomy at L4-5

on November 2, 2002.  *Id.* at pp. 201-03.  After the surgery, Wooding continued to complain of back

pain for which she was prescribed medication.  *Id*. at pp. 205-06.  On December 27, 2002, Wooding

reported to Dr. Garrison that she continued to have some low back pain with pain in both legs, but it

is "improving with decreased frequency."  *Id*.  at p. 207.  Upon examination, Dr. Garrison noted her

incision was well healed and there were no signs nor symptoms of infection.  Wooding continued to

have slight diminished sensation in the L5 distribution on the right compared to the left.  *Id*.  Dr.

Garrison restricted Wooding to lifting no more than five pounds and no bending, twisting, or stooping.

*Id*. at pp. 197 & 207.  He further asked her to increase her activities by walking on her treadmill at

home for fifteen minutes, twice a day, but she should not do any "impact physician [sic] activities."

*Id*. at p. 207.  On February 7, 2003, though Wooding continued to complain of leg and low back pain,

Dr. Garrison lifted all restrictions and referred Wooding to physical therapy, however, her

obstetrician/gynecologist (ob/gyn) recommended that she not start physical therapy due to her recent

pregnancy.  *Id*. at pp. 208-09.

## B.  Procedural History

On July 23, 2001, Wooding protectively filed for SSI benefits alleging a disability onset date

of October 29, 1999.[5]  Tr. at pp. 90-93.  The application was denied initially.  *Id.* at pp. 72-76.  Because

---

[5] Both Plaintiff and Defendant mistakenly note August 7, 2001, as the protective filing date.  Dkt. No. 6,  Pl.'s Br. at p. 2; Dkt. No. 7, Def.'s Br. at p. 3.  Upon our review of the Administrative Transcript, we note that a Leads/Protective Filing Worksheet was completed on July 23, 2001, presumably as a result of an oral inquiry (whether in person or by phone) made on behalf of Wooding.  Tr. at p. 90.  Because her SSI application was filed within sixty days of this oral inquiry, the Social Security Administration allows for that "protective" date to be used as the filing date, and such date is indeed reflected (continued...)

this case was an expedited prototype case, the reconsideration phase was bypassed.  Dkt. No. 7, Def.'s

Br. at p. 3 (citing 20 C.F.R. § 404.906).  On May 8, 2003, a Hearing was held before Administrative

Law Judge (ALJ) John M. Lischak, who, on July 1, 2003, determined that Wooding was not disabled.

Tr. at pp. 12-17 & 19-71.  On August 13, 2003, Wooding appealed that unfavorable determination to

the Appeals Council.  *Id*. at pp. 211-12.  In her appeal, Wooding asked, *inter alia*, that her case be

remanded for calculation of benefits for the period of October 29, 1999, the date of her motor vehicle

accident, until February 7, 2003, the date in which her doctors lifted her physical restrictions.  *Id*.  On

September 23, 2003, the Appeals Council concluded there was no basis under the Regulations to grant

Plaintiff's request for review, thus rendering the ALJ's decision the final determination of the

Commissioner.  *Id.* at pp. 4-6.  Exhausting all her options for review through the Social Security

Administration's (SSA) tribunals, Plaintiff now brings this appeal.

## II.  DISCUSSION

### A.  Standard of Review

Under 42 U.S.C. § 405(g), the proper standard of review for this Court is not to employ a *de*

*novo* review, but rather to discern whether substantial evidence supports the Commissioner's findings

and that the correct legal standards have been applied.  *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d

Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson*

*v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Succinctly defined, substantial evidence is "more than

---

[5](...continued)
on her SSI application.  Tr. at p. 91 (SSI application with a notation that the protective filing date is July 23, 2001); *see also* 20 C.F.R. § 416.345 (providing for the date of an oral inquiry to be used as the application filing date, as long as other conditions are met).  This protective filing date is important in the event benefits are awarded as it is a crucial starting point for the calculation of such benefits.  *See* 20 C.F.R. § 416.335 (noting that, upon meeting all eligibility requirements for entitlement to SSI, the earliest date upon which benefits can be paid is the "month following the month [a claimant] filed the application").

a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g). Where the weight of the evidence, however, does not meet the requirement for substantial evidence or a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed. *Johnson v. Bowen*, 817 F.2d at 986.

### B.  Determination of Disability

The SSI program, 42 U.S.C. § 1381, *et seq.*, is a federal program providing benefits to needy aged, blind, or disabled individuals who meet the statutory income and resource limitations. 20 C.F.R. § 416.110. The SSI program was designed to replace the former federally assisted state welfare programs for the aged, blind, or disabled. *Id*. While the SSI program has special eligibility requirements that relate to establishing need,[6] the requirements for establishing disability, found at 42 U.S.C. § 1382c, are identical to the requirements under Title II of the Social Security Act for entitlement to disability insurance benefits (DIB). *See* 42 U.S.C. § 423(d). Therefore, the vast case law interpreting the disability provisions under Title II may be relied upon in this case.

To be considered disabled within the meaning of the Social Security Act, a plaintiff must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

---

[6] SSI benefits may not be paid unless a claimant meets the income and resource requirements of 42 U.S.C. §§ 1382a, 1382b, and 1382c(a)(3)(A).

lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  Furthermore, the claimants physical or mental impairments must be of such severity as

to prevent engagement in any kind of substantial gainful work which exists in the national economy.

*Id*. at § 423(d)(2)(A).

    In determining whether a claimant is disabled, the Commissioner follows a five-step analysis

set forth in the SSA Regulations.  20 C.F.R. § 416.920.  At Step One, the Commissioner "considers

whether the claimant is currently engaged in gainful activity."  *Berry v. Schweiker*, 675 F.2d 464, 467

(2d Cir. 1982).  If the claimant is engaged in substantial gainful activity, he or she is not disabled and

the inquiry ends.  If the claimant is not engaged in substantial gainful activity, the Commissioner

proceeds to Step Two and assesses whether the claimant suffers from a severe impairment that

significantly limits his or her physical or mental ability to do basic work activities.  20 C.F.R. §

416.920(c).  If the claimant suffers from a severe impairment, the Commissioner considers at Step

Three whether such impairment(s) meets or equals an impairment listed in Appendix 1, in Part 404,

Subpart P of the Regulations.  *Id*. at § 416.920(d).  The Commissioner makes this assessment without

considering vocational factors such as age, education, and work experience.  *Berry v. Schweiker*, 675

F.2d at 467.  Where the claimant has such an impairment the inquiry ceases as he or she is presumed

to be disabled and unable to perform substantial gainful activity.  *Id*.  If the claimant's impairment(s)

does not meet or equal the listed impairments, the Commissioner proceeds to Step Four and considers

whether the claimant has the residual functional capacity (RFC)[7] to perform his or her past relevant

work despite the existence of severe impairments.  20 C.F.R. § 416.920(e).  If the claimant cannot

---

[7] "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is what you can still do despite your limitations."  20 C.F.R. § 416.945(a).

perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy. *Berry v. Schweiker*, 675 F.2d at 467; 20 C.F.R. § 416.920(f).

Initially, the burden of proof lies with the claimant to show that his or her impairment(s) prevents a return to previous employment (Steps One through Four). *Berry v. Schweiker*, 675 F.2d at 467. If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five to establish, with specific reference to medical evidence, that the claimant's physical and/or mental impairment(s) are not of such severity as to prevent him or her from performing work that is available within the national economy. *Id.*; 42 U.S.C. § 423(d)(2)(A); *see also White v. Sec'y of Health and Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990). In making this showing at Step Five, the claimant's RFC must be considered along with other vocational factors such as age, education, past work experience, and transferability of skills. 20 C.F.R. § 416.920(f); *see also New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

### C. ALJ Lischak's Findings

Wooding was the only witness to testify at the ALJ Hearing. Tr. at pp. 19-71. In addition to such testimony, the ALJ had Wooding's medical records consisting of treatment reports and opinions from various treating and consultive examining physicians, including, 1) Brett Tallents, M.D., Treating Chiropractor; 2) Harold Weichert, M.D., Treating Orthopedist; 3) Kalyani Ganesh, M.D., Consultive Examiner; 4) Robert Garrison, M.D., Treating Orthopedist; and 5) Anthony Matan, M.D., Treating Orthopedist. *Id.* at pp. 136-210.

Using the five-step disability evaluation, ALJ Lischak found that 1) Wooding had not engaged in any substantial gainful activity since the filing of her application; 2) she has severe medically

determinable impairments, namely internal derangement of the right knee and degenerative disc disease of the lumbar spine; 3) her severe impairments do not meet nor medically equal any impairment listed in Appendix 1, Subpart P of Social Security Regulation No. 4; 4) she has the RFC to perform sedentary work, yet, the demands of her past relevant work as a cashier exceed her RFC; but 5) in light of her RFC, she is capable of performing work that exists in the national economy and therefore is not disabled. *Id.* at pp. 16-17.

### D. Wooding's Contentions

Plaintiff contends that the ALJ's decision denying benefits should be reversed because (1) the ALJ erred by failing to award her a closed period of disability from October 29, 1999 until February 7, 2003; and (2) the ALJ erred by finding that Plaintiff had the RFC for a full range of sedentary work. Dkt. No. 6.

We first address Plaintiff's argument that the ALJ erred when he failed to award a closed period of disability. Oftentimes, a social security applicant's disability ceases prior to the Commissioner rendering a decision. In recognition of the potential for such circumstance, and as long as certain requirements are met, the SSA allows for an award of benefits relegated to a finite or closed period of disability. *See* SSA's Program Operations Manual System (POMS) at § DI 25510.001, *available at* https://secure.ssa.gov/apps10/ (last visited May 28, 2008).[8] Closed period awards are available for DIB

---

[8] The relevant POMS section reads as follows:
When evidence established that the claimant was unable to engage in [substantial gainful activity] for a continuous period of 12 months, but by the time the determination is made, the claimant is no longer disabled, a closed period may be indicated, if all other requirements are met.
POMS at § DI 25510.001.

For SSI, those requirements are as follows:
A closed period allowance may be indicated when an individual had an impairment that:
    A. prevented [substantial gainful activity] at least 12 months, and
    B. continued to or through the month of filing, and

(continued...)

*-11-*

and SSI applications.  POMS at §§ DI 25510.010 (DIB) & DI 25510.015 (SSI).  Generally, when an applicant's disability ceases prior to a final determination, a closed period of disability can be rendered in the same decision as the finding of disability.  *Myers v. Richardson*, 471 F.2d 1265 (6th Cir. 1972) *reprinted in* Social Security Regulation ("SSR") 74-6C, 1974 WL 11143, *Court Decision: Disability Issues Determinable by Secretary in Single Hearing Cessation of Disability* (S.S.A. 1974) (noting that under such circumstance, the ALJ need not hold another hearing nor issue a separate decision regarding the cessation of disability); *Pickett v. Bowen*, 833 F.2d 288, 289 n.1 (11th Cir. 1987) (explaining what a closed period case entails).

Before assessing the viability of Plaintiff's closed period argument, we must address the parameters of the closed period for it is somewhat unclear what period of time Plaintiff proposes encompasses her closed period of disability.  The heading in Wooding's Brief asserts a closed period of October 29, 1999, the date of her motor vehicle accident, to February 7, 2003, the date her physicians lifted her physical restrictions.  Dkt. No. 6, Pl.'s Br. at p. 6.  However, in a letter to the Appeals Council Plaintiff requested, for the first time, that her claim for disability be considered as a closed period of disability from the "date of her application until February 7, 2003" and be remanded to the ALJ for calculation of benefits for such time period.[9]  Tr. at pp. 211-12.  As Wooding has only applied for SSI,

---

[8](...continued)
          C. ceased in or after the month of filing but prior to the date of adjudication.
POMS at § DI 25510.015.

   [9] In highlighting the fact that Wooding alerted the Appeals Council, but not the ALJ, to her desire for a closed period disability review we do not mean to imply that a claimant's failure to apprise the SSA at any (or every) level of her specific request for closed period disability review would be fatal to seeking federal review.  Indeed, neither the SSA's Regulations nor POMS provides a distinct procedure for claimants to follow in seeking a closed period review.  Instead, POMS simply provides that such review is available.  *See generally* POMS §§ DI 25510.001 through 25510.015.  Our curiosity of this discrete concept unearthed at least one district court judge within this Circuit who remanded the case to the ALJ in order to perform a closed period disability review, notwithstanding the fact that no such review had been sought by the claimant in the SSA.  *See Pena v. Barnhart*, 2002 WL 31487903 (S.D.N.Y. Oct. 29, 2002).  We also discovered that some Circuits require closed period qualification assessments regardless of any specific request.  *See, e.g., Quimby v. Astrue*,
(continued...)

we may easily disabuse her of any notion that she would be eligible for benefits prior to July 2001, the month in which she protectively filed for benefits. In fact, pursuant to the Regulations, Wooding would only be eligible for benefits starting in August 2001. *See* 20 C.F.R. § 416.335 (noting that for SSI applicants, upon meeting all eligibility requirements, the earliest date upon which benefits can be paid is the "month following the month [a claimant] filed the application").[10] In terms of assessing disability during a closed period, we look at the her disability status during the month she filed her application. *See supra* note 8. Thus, the correct closed period is July 23, 2001 through February 7, 2003. With that matter settled, we review the ALJ's analysis of Wooding's claim of disability.

It is clear that ALJ Lischak did not consider the prospect of awarding benefits to Wooding for a closed period. Indeed, in performing the sequential disability analysis, the ALJ placed great emphasis on the fact that Plaintiff's serious conditions had improved post surgery. And, in focusing on the fact that, as of the date of the decision (July 1, 2003), Plaintiff did not present restrictions greater than those needed to complete sedentary work, it is clear that no consideration was given to Plaintiff's disability status during the closed period. Because the ALJ did not address Plaintiff's disability status during the relevant closed period, we deduce that his decision does not foreclose a finding of closed period disability. Taking that deduction one step further, there simply is no opinion for us to review at this

---

[9](...continued)
2008 WL 660180, at *4 (D.Me. Mar. 5, 2008) (citing *Payton v. Shalala*, 25 F.3d 684, 686 (8th Cir. 1994) for the proposition that in the Eighth Circuit, an ALJ is "required to consider the possibility that an applicant is qualified for a closed period of benefits" and "assuming *arguendo*" that the First Circuit takes the same view). We need not address the issue of whether the Second Circuit requires notice to the SSA or requires the SSA to always consider a closed period of disability since, in our case, Wooding alerted the Appeals Council of her request for a closed period. By refusing to review the ALJ's disability determination, the Appeals Council implicitly upheld as proper the ALJ's failure to consider a closed period of disability.

[10] This is distinguishable from DIB applicants who may seek benefits retroactive to the onset disability, provided however, that the disability commenced at a time when the claimant met the insured status requirements of the Social Security Act. 42 U.S.C. §§ 423(a)(1)(A) & (c)(1); 20 C.F.R. §§ 404.130 & 404.315(a). Given Wooding's young age and relatively brief work history, it is unlikely that she would have qualified for DIB.

*-13-*

juncture with respect to Plaintiff's disability status during the closed period and the best course of action would be to remand this case back to the Commissioner for further proceedings before an ALJ. Upon remand, the ALJ should develop the record further, if necessary, which could include obtaining medical statements from Wooding's various treating physicians and taking further testimony. The ALJ shall then render a decision as to whether Wooding was disabled during the closed period of July 23, 2001 through February 7, 2003. In rendering such decision, we offer the following analysis and guidelines.

In assessing Wooding's RFC, the ALJ reviewed the medical evidence, varying opinions rendered by the treating and consultive physicians, and Wooding's subjective complaints. Upon remand, the ALJ should re-evaluate Wooding's RFC during the closed period only. In this regard, the ALJ will need to reassess the weight given to certain treating physicians' opinions. For example, Dr. Weichert, on September 20, 2000, restricted Wooding to no lifting, bending, or twisting. Tr. at p. 165. ALJ Lischak accorded such restrictions no "great weight in determining [Wooding's RFC] because these limitations were attributed to the claimant's disc herniation, which has since been corrected with surgery." *Id*. at p. 14. While it may be true that as of July 1, 2003, Dr. Weichert's opinion may have been rendered moot, such opinion may be highly instructive in determining Wooding's disability status as of July 23, 2001, the protective filing date. To be clear, we are not directing at this point that controlling weight be afforded to this opinion. We merely direct that the ALJ do an independent analysis of this assessment under the Treating Physician Rule with a focus on Wooding's disability status during the closed period. In this regard, the ALJ should consider whether the opinion is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(d)(2).

Similarly, when assessing Wooding's RFC, the ALJ gave "little weight" to the physical limitation assessment completed by Dr. Tallents in February 2000 because he had not treated Wooding since March 2000 and because chiropractors are not "acceptable sources" of medical opinions. It is true that pursuant to the Regulations, Dr. Tallants, as a chiropractor, is not an acceptable medical source who may provide evidence to establish an impairment. However, a chiropractor may provide evidence to show the severity of an impairment and how it affects a claimant's ability to work. 20 C.F.R. § 404.1513(d). Thus, though not entitled to controlling weight, upon remand, the ALJ should consider Dr. Tallant's opinions as to the severity and limiting affect of Wooding's impairments during the closed period.

The opinions of Drs.' Weichart and Tallants should not be viewed in a vacuum, but should be considered in light of the significant lapse of time, spanning two years, between Dr. Tallant's February 2000 assessment, Dr. Weichart's September 2000 assessment, and the November 2, 2002 microdiscectomy. It is important to note that the delay in obtaining surgery was not because Wooding's condition improved or because she was pursuing other treatment options. In fact, she made it quite clear that she feared having an epidural needle and each doctor she saw agreed that surgery was the most viable option. The significant delay is attributable to circumstances that were beyond Wooding's control, namely insurance disputes and the retirement of her treating physician. As aptly stated by Dr. Weichart on July 18, 2001 (just days before she protectively filed for SSI benefits), "it is in the hands of [Wooding's] lawyer now and hopefully he can get her approval to have [the microdiscectomy] done. . . . [This] is not a good state of affairs for her because the longer she has the problem, the longer it takes to recover in general." Tr. at p. 161. In reviewing Dr. Tallant's February 2000 assessment and Dr. Weichart's September 2000 assessment, the ALJ shall consider whether Wooding's condition

*-15-*

improved, worsened, or remained the same during the significant period of time before the surgery was completed and before the date on which Dr. Garrison lifted her physical restrictions. Similarly, in considering Wooding's subjective complaints, the ALJ should consider what her physical activities consisted of during the closed period, and not as of the date of the May 2003 Hearing. A re-taking of her testimony focusing only on that period could prove helpful. And, finally, the ALJ shall consider what weight, if any, should be given to the opinion rendered by Consultive Examiner Dr. Ganesh. The Treating Physician Rule will play a critical role in what weight to afford Dr. Ganesh's opinion regarding Plaintiff's capabilities during the closed period since Plaintiff's treating physicians' opinions seem to controvert Dr. Ganesh's opinion. In the event the ALJ affords more weight to Dr. Ganesh's opinions over those of the treating physicians, the ALJ must specifically set forth the reasons for doing so and what weight each opinion is given.

### III. CONCLUSION

"Upon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard, we generally . . . remand the matter to the Commissioner for further consideration." *Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000) (citation omitted). Accordingly, because the ALJ failed to consider whether Wooding was disabled during the closed period of July 21, 2001 through February 7, 2003, the Court need not – indeed, cannot – reach the question of whether the Commissioner's denial of benefits was based on substantial evidence. The case should be remanded to the Commissioner to further develop the record. To be clear, in directing this remand for further proceedings, we are not restricting the ALJ to re-assess only Wooding's RFC during the closed period. We would require that the entire sequential disability evaluation, Steps One through Five, if necessary, be conducted as to the closed period. Thus, for the reasons stated herein, it is hereby

**RECOMMENDED**, that the Commissioner's decision denying disability benefits be **VACATED and REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date:   May 28, 2008
        Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge